### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>KRIS A. SWAFFER, SEAN K. WILLIAMS, and POHIH, Inc., )<br><br>Defendants, )<br><br>and )<br><br>ROSALYN K. SWAFFER, )<br><br>Relief Defendant. ) | Case No. 1:22-cv-1554<br><br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("SEC"), alleges:

## SUMMARY

1.      This case involves unregistered, fraudulent offerings of securities and misappropriation of investor funds by Kris A. Swaffer ("Swaffer") from at least September 2016 through February 2020, and Sean K. Williams ("Williams") after Williams began working with Swaffer in early 2017.  Swaffer and Williams—through POHIH, Inc. ("POHIH") as well as other entities controlled by Swaffer, including 5 Letters, LLC and MAK North America, LLC, (previously known as Macedonian American K North America, LLC) (collectively, the "Pure Organic Entities")—raised a total of approximately $14 million from approximately 75 investors in at least 14 states for, ostensibly, an international marijuana business (the "Pure Organic

Offerings").  To recruit prospective investors, Swaffer, and later Williams, knowingly or recklessly made material misrepresentations about the use of funds raised in the Pure Organic Offerings and the risks associated with the investments.  Swaffer and Williams each assured investors that their investments would be used to fund the business operations of the various Pure Organic Entities.  While some money raised from investors was used for that purpose, Swaffer misappropriated a significant amount of the investor funds for his personal use.  After approximately April 2017, Williams also misappropriated investor funds.

2.      Swaffer misled investors about his background, portraying himself to potential investors as a wealthy, successful businessman, while concealing the reality that he was deep in debt and at risk of losing his home.  He claimed he would benefit from the business by receiving distributions of profit alongside other investors.  In reality, he misappropriated investor funds throughout the entire time period of the Pure Organic Offerings, including by using investor money to pay off debts owed by him and his wife, Rosalyn K. Swaffer ("Rosalyn Swaffer"), and to fund their personal expenses.

3.      Williams initially became involved in the Pure Organic Offerings as an investor, but by November 2016, he began to participate in raising money from other investors.  In approximately February 2017, he became the Chief Operations Officer of one of the Pure Organic Entities.  His activities included overseeing the operations of the Pure Organic Entities and raising money from investors

4.      Beginning in at least April 2017, Swaffer paid Williams outside of regular payroll using investor funds.  By April 2018, after Williams and Swaffer started routing investor funds through an account in the name of an unrelated entity that Williams controlled, Williams began misappropriating investor funds himself by transferring them to his personal bank accounts.  By

at least August 2018, Williams was aware of Swaffer's misappropriation of funds, yet Williams continued to raise money from new and existing investors and to knowingly or recklessly mislead them about how their funds were to be used.

5.  Swaffer and Williams also knowingly or recklessly misrepresented the risks associated with investing in the Pure Organic Offerings to potential investors.  Swaffer and Williams falsely assured potential investors that they had addressed all issues related to the legality of the contemplated marijuana business and its proceeds, when in fact they knew, or were reckless in not knowing, there was a risk that the business could be found to be in violation of federal laws.  Indeed, multiple financial institutions had closed accounts associated with Swaffer and the Pure Organic Entities due to their connection with a marijuana business. As a result, beginning in April 2018, Swaffer and Williams routed investor funds through an account in the name of an entity wholly unrelated to the Pure Organic Entities, controlled by Williams.

6.  The Pure Organic Entities never made any distributions of profits to investors or generated revenues.  Williams ceased working for the business by December 2019.  Though Swaffer continued raising funds from investors through February 2020, his communications with investors became infrequent and sporadic, and he ceased contact with most investors in 2021.

7.  As a result of their conduct, Swaffer and Williams knowingly or recklessly committed securities fraud.  Swaffer, Williams, and POHIH also violated the securities laws by offering and selling unregistered securities.

8.  Swaffer and Williams violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      POHIH violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

10.     Rosalyn Swaffer benefited from these violations of the securities laws by receiving ill-gotten gains to which she has or had no legitimate claim.

11.     The SEC brings this lawsuit to prevent further harm to investors and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

12.     Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## JURISDICTION AND VENUE

13.     The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d)(3), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(e), and 78aa].

15.     In connection with the conduct alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 77aa]

because a substantial part of the events or omissions that give rise to claims alleged in this Complaint occurred in this District.  Assignment to the Eastern division (Cleveland) is appropriate because many of Defendants' illegal activities occurred in Lorain County.

17.    Defendant Williams resided in and transacted business within the Northern District of Ohio, and Defendants Swaffer and POHIH each transacted business within the Northern District of Ohio.

## DEFENDANTS

18.    **Kris A. Swaffer**, age 60, is a resident of Cadillac, Michigan.  Swaffer is the President of POHIH and owns the majority of POHIH shares indirectly through a limited liability company he controls.  He was the manager and Chief Executive Officer of 5 Letters, LLC ("5 Letters").  From November 2016 through April 2018, he was the manager of MAK North America, LLC, previously known as Macedonian American K North America, LLC ("MAK") and owned the majority of its membership interests indirectly through 5 Letters.

19.    **Sean K. Williams**, age 51, is a resident of Avon, Ohio.  He was the Chief Operating Officer of 5 Letters and the majority owner and manager of SRTK, LLC ("SRTK").

20.    **POHIH, Inc.**, is a Texas corporation organized in April 2018 with its principal place of business in Dallas, Texas.  POHIH is the successor to MAK and is the majority owner of a North Macedonian entity that was engaged in the business of cultivating cannabis for commercial purposes.

## RELIEF DEFENDANT

21.    **Rosalyn K. Swaffer**, age 55, is a resident of Cadillac, Michigan and is married to Defendant Kris A. Swaffer.

## FACTS

### Swaffer's and Williams' Foray into the Marijuana Business

22.     Prior to entering the marijuana industry, Swaffer owned and operated auto dealerships in the State of Michigan.

23.     By late 2013, Swaffer's auto dealership business had collapsed, he had been sued in state court for hundreds of thousands of dollars in unpaid loans related to his auto dealership business, and the home he and his wife owned had been foreclosed on by the mortgage lender.

24.     In 2016, Swaffer began organizing and acquiring the Pure Organic Entities to engage in the cultivation of marijuana for commercial purposes.  Swaffer, through two of the Pure Organic Entities, sought but did not obtain licenses to legally cultivate and distribute marijuana in Texas and Michigan.  One of the Pure Organic Entities purportedly obtained a license in North Macedonia and began operations in late 2016 after legalization in that country.

25.     In October 2016, Williams invested in Swaffer's marijuana business.  Soon after, Williams began assisting Swaffer in raising money from investors, including by preparing slide decks and projections that were shown to certain potential investors.

26.     In approximately February 2017, Williams became the Chief Operating Officer of one of the Pure Organic Entities—5 Letters.  His responsibilities included supervising business operations in North Macedonia and communications with potential and actual investors.

27.     Williams previously worked in logistics for a trucking company in Ohio.

### Defendants Conducted Unregistered Securities Offerings

28.     Beginning in September 2016, Swaffer began raising money from investors by offering and selling membership interests and stock in the Pure Organic Entities, including

MAK, a predecessor entity to POHIH, and later POHIH.  Williams joined Swaffer in offering and selling these securities by November 2016.

29.     Swaffer and Williams initially offered and sold membership interests in MAK. From at least October 2016 through April 2018, Swaffer and Williams offered and sold membership interests in MAK in a continuous offering, during which time they raised at least $5.6 million from at least 33 investors in multiple states, including at least one unaccredited investor.

30.     In April 2018, Swaffer formed POHIH as MAK's successor.  All outstanding MAK membership interests were converted to POHIH stock, and Swaffer and Williams began offering and selling additional shares of POHIH stock to new and pre-existing investors.  From at least April 2018 through June 2019, Swaffer, Williams, and POHIH offered and sold stock in POHIH in a continuous offering, during which time they raised at least $5.8 million from at least 37 investors in multiple states, including at least one unaccredited investor.

31.     In all, Swaffer, Williams, and the Pure Organic Entities, including POHIH, raised approximately $14 million from approximately 75 investors in at least 14 states between September 2016 and February 2020.

32.     Swaffer and Williams recruited investors through in-person conversations, through telephone calls, and through email.

33.     Swaffer and Williams made no effort to assess potential investors' sophistication or accreditation status, and unaccredited investors participated in the Pure Organic Offerings. Many investors had no pre-existing relationship with Swaffer, Williams, or the Pure Organic Entities.

34.     Swaffer and Williams represented to potential investors in the Pure Organic Offerings that they would pool the money raised from investors and use it to fund the operations of the various Pure Organic Entities.

35.     Investors in the Pure Organic Offerings did not exercise any control or authority over the operations of the Pure Organic Entities.  Swaffer exercised ultimate control and authority over the operations of the Pure Organic Entities, and investors relied on his managerial skills to provide a return on their investments.

36.     Swaffer, Williams, and POHIH used interstate commerce when they offered and sold investments in the Pure Organic Offerings in multiple states by, among other things, corresponding with potential investors via emails and telephone calls and receiving investor funds via interstate wire transfers.

37.     The investments in the Pure Organic Entities offered and sold by Swaffer, Williams, and POHIH were securities.

38.     No registration statement was ever filed with the SEC or has ever been in effect with respect to any offers and sales of investments in MAK, POHIH, or any of the Pure Organic Entities.

**Swaffer and William Misrepresented the Risks of the Investments**

39.     Since at least January 2017, Swaffer and Williams knew, or should have known, there were numerous risks associated with an investment in the Pure Organic Offerings.  Among these were the risk of the Pure Organic Entities being deemed to be in violation of federal laws, which presented serious consequences related to the receipt and taxation in the United States of any proceeds they generated, and the related risk that financial institutions would be unwilling to provide services to marijuana-related businesses due to the illegality of marijuana under federal

law.  Swaffer and Williams described these risks in a private placement memorandum ("PPM")

they provided to a potential investor in January 2017.

40.    Among other things, the PPM disclosed: "**Investors risk criminal liability and

cannabis business assets are subject to forfeiture.**  Because marijuana is federally illegal,

investing in cannabis businesses could be found to violate the federal Controlled Substances Act.

Not only can Members, Managers and the Company be indicted under federal law, all of the

assets they contribute to the Company (and even to an ancillary cannabis business), including

real property, cash, equipment and other goods, could be subject to asset forfeiture."

41.    The PPM also stated: "**Marijuana businesses may still not be able to secure

bank accounts.**  Though banks are providing services to marijuana businesses, most banks and

financial institutions will not because they worry about criminal liability under the federal

Controlled Substances Act and money laundering under the Bank Secrecy Act."

42.    After January 2017, however, Swaffer and Williams did not distribute the PPM or

otherwise disclose these risks to potential investors.  Instead, they assured potential investors in

oral communications that the business was fully licensed and could legally operate in the

marijuana industry and receive any business proceeds in the United States.

43.    Among other occasions, Swaffer made these representations to certain investors

in telephone calls, including calls held in or about May 2018, October 2018, and April 2019.

44.    Among other occasions, Williams made these or substantially similar

representations to certain investors who resided in the Northern District of Ohio in a telephone

call held in or about May 2019 and during an in-person meeting with one of the same investors

held in Avon, Ohio in or about May 2019.

45.     These statements were false and misleading because Swaffer and Williams failed to disclose that the business could be found in violation of federal law and the consequences of such a determination.

46.     Indeed, Swaffer and Williams knew but failed to disclose to prospective investors after January 2017 that, given the federal laws, financial institutions could be, and indeed were, unwilling to provide financial services to the Pure Organic Entities' marijuana business.

47.     Between May 2017 and May 2018, Swaffer moved investor funds through a succession of at least 10 accounts at different financial institutions as, one after another, accounts were closed due to their association with a marijuana-related business.

48.     By April 2018, one bank account on which Williams was also a signer, along with Swaffer and Rosalyn Swaffer, had been closed because of its association with a marijuana-related business.  Around this time, Swaffer told Williams that he was on a watch list and unable to open a bank account, and Swaffer and Williams agreed to use a bank account that Williams controlled to receive investor money and fund the operation of the business.  This bank account was in the name of SRTK, an entity controlled by Williams that was not related to the Pure Organic Entities.

49.     Williams opened the SRTK account in April 2018, and had signatory authority and control over the account.  Williams maintained his own record of transactions in the account, which he prepared by downloading transactional data from the bank's website and adding a column in which he noted the purpose of each transaction.

50.     Between April 2018 and October 2019, at Swaffer's direction, Williams instructed dozens of investors to send their investment funds to the SRTK account without disclosing that it had no legal relationship to the Pure Organic Entities.

10

51.     Williams falsely told at least one investor, in an email sent on or about May 15, 2019, that the SRTK account was "our us [United States] clearing account managed by our lawyers and cpa firm," when in reality Williams controlled the account.

52.     The false and misleading statements made by Swaffer and Williams at various times after September 2016 were material.  A reasonable investor would have wanted to know: a) about the risks arising from the legal status of Defendants' marijuana-related operations; b) that Swaffer and Williams knew that the Pure Organic Entities could not conduct an ordinary course of business in the U.S. or have financial transactions in their own names; and c) that Swaffer and Williams, after April 2018, had diverted business capital (i.e., investor funds) to a wholly unrelated entity (STRK), increasing the risk of misuse and misappropriation.

**Swaffer and Williams Misrepresented the Use of Investment Funds**

53.     Swaffer and Williams also knowingly or recklessly made false and misleading statements to potential investors regarding the use of proceeds raised in the Pure Organic Offerings.

54.     As set forth further below, from the inception of the Pure Organic Offerings until early 2020, Swaffer used investor funds for personal use.  Beginning in April 2017, Williams accepted payments of investor funds outside of payroll; and beginning in April 2018, Williams directly misappropriated investor funds.

55.     Swaffer and Williams provided some potential investors with documents that included statements about the use of proceeds raised in the Pure Organic Offerings, including slide decks and projections of revenues and expenses (the "Offering Materials").

56.     Williams prepared these Offering Materials and Swaffer approved them before Swaffer and Williams distributed them, including by emailing them to potential investors.

57.     The various slide decks that were part of the Offering Materials included a slide titled "Proposal for Investment."  This slide stated that working capital was needed for the following categories of expenses:  building, land, equipment, final licensing, and employee background checks.  Neither this slide nor any other slide included in such investor presentations disclosed that working capital would be used for compensation or personal expenses of Swaffer and/or Williams.

58.     Swaffer displayed or distributed slide decks with the slide described above (in paragraph 57) to investors between at least November 2016 and April 2017, including during a December 2016 investor meeting in Avon, Ohio, and in a January 2017 email to another investor.

59.     Between at least March 2017 and May 2019, Swaffer and Williams also displayed, distributed, or emailed to potential investors spreadsheets with detailed labor expense projections that included line items for compensation to various categories of employees.  The spreadsheets did not include entries for compensation to the company's officers or for personal expenses.

60.     In addition to making written representations in the Offering Materials about how investor funds would be used, Swaffer and Williams also told a number of prospective investors orally that they would use money raised from investors to fund business operations.

61.     Swaffer made such false oral representations about the use of proceeds from the Pure Organic Offerings to numerous investors between September 2016 and February 2020, including during a December 2016 meeting in Avon, Ohio, and a May 2018 telephone conversation.

62.     Among other occasions, Williams made similar false representations to certain investors who resided in the Northern District of Ohio in a telephone call held in or about May 2019 and during an in-person meeting with one of the same investors held in Avon, Ohio in or about May 2019.

63.     To induce prospective investors into believing he was worthy of their trust and confidence, Swaffer presented himself in oral conversations, and in written biographies included in the slide decks, as a successful and wealthy businessman.  Further, Swaffer claimed he stood in the same position as investors, and would only receive future potential distributions of profit alongside other investors.  Swaffer even distributed a company agreement for MAK to certain investors by email (the "MAK Company Agreement"), which included a provision stating that "[t]he Manager [Swaffer] shall not be compensated for its services as the Manager, but the Company [MAK] shall reimburse the Manager for all ordinary, necessary, and direct expenses incurred by the Manager on behalf of the Company in carrying out the Company's business activities.  All reimbursements for expenses shall be reasonable in amount."

64.     When touting his purported professional success, Swaffer failed to disclose his past legal and financial troubles to potential investors, and did not tell them his auto dealership business had collapsed, his home had been foreclosed upon, and that he was deep in debt by September 2016.

65.     As of the beginning of September 2016, Swaffer owed more than $800,000 to a financial institution, which was due at the end of the month, pursuant to an agreement he had signed to avoid eviction.  In October 2016, the deadline for full payment was extended to December 2016 in exchange for $81,000 that Swaffer paid the bank using investor funds he had raised in the Pure Organic Offerings.

66.     Additionally, as of September 2016, Swaffer owed hundreds of thousands of dollars as a result of unpaid loans associated with his auto dealership business.

67.     After September 2016, Swaffer did not tell prospective investors that he had first used investor funds to pay his and his wife's personal expenses in September 2016 or that he would, and did, continue to do so thereafter.

68.     A reasonable investor would have wanted to know about Swaffer's business failings and lack of personal financial resources before entrusting funds to his discretion for a new and uncertain business venture.

69.     A reasonable investor would also have wanted to know if Swaffer, or Williams, had used or would use investor funds for personal expenses unrelated to the Pure Organic Offerings.

**Swaffer Misused Investor Funds and Williams Later Joined in the Misuse**

70.     Contrary to their representations to potential investors about the intended use of proceeds in the Pure Organic Offerings, Defendants used only a portion of the funds raised from investors to finance business operations.  Instead, Swaffer, and later Williams, misappropriated a substantial portion of the funds raised from investors.

71.     The Pure Organic Entities were funded almost exclusively from investor deposits. The entities never generated revenues from operations or distributed profits to investors.  Thus, any monies Swaffer and Williams received from the entities were necessarily derived from investors in the Pure Organic Offerings.

72.     Between September 2016 and March 2020, including throughout the entire period he solicited investments in the Pure Organic Entities, Swaffer misappropriated at least $2.4 million by transferring investor funds to accounts that he and his wife controlled that were

14

unrelated to the Pure Organic Entities and by directly paying his and his wife's personal

expenses.  He used this money for personal purposes, including to repay old debts associated

with his foreclosed home and auto dealerships that were jointly owed with his wife, Rosalyn

Swaffer; pay for home renovations, cars, and boats; and to pay for his and his wife's routine

personal expenses, such as grocery and clothing purchases.

73.     Swaffer's misappropriation of the proceeds of the Pure Organic Offerings directly

benefited his wife.  Between at least September 2017 and March 2020, Rosalyn Swaffer received

over $800,000 in payments made directly to her or for her joint or individual benefit, including

over $150,000 for personal credit cards and $35,000 in transfers to a personal bank account.

74.     Williams learned of Swaffer's misappropriation by at least August 2018, when

Williams saw transactions in the SRTK account with no apparent business purpose that Swaffer

or his wife had initiated by using account information previously obtained from Williams,

including the debit card, routing, and account numbers.  Around the same time, Williams

initiated other transactions for Swaffer's personal benefit at Swaffer's direction.  Williams asked

Swaffer about the purpose of these transactions, and Swaffer did not provide any business

justification for the spending.  After that, Williams continued to both initiate transactions for

Swaffer's personal benefit at Swaffer's direction and allow Swaffer and his wife to initiate other

transactions for their personal benefit.  In the records that he maintained of the SRTK account,

Williams described these transactions as expenses of Swaffer or Rosalyn Swaffer.

75.     Between April 2018 and June 2019, Williams recorded that Swaffer received or

made approximately $99,552 in net withdrawals from the SRTK account for Swaffer and/or his

wife's personal expenses.

76.     After approximately August 2018, despite his awareness of Swaffer's misappropriation, Williams continued to raise money from investors and knowingly or recklessly mislead them about the use of their funds (as described in paragraphs 59, 60 and 62 above).

77.     Throughout the time period of the Pure Organic Offerings, Williams knew that the Pure Organic Entities had not generated any revenue.  Despite this knowledge, Williams accepted payments initiated by Swaffer from bank accounts holding investor funds raised for the Pure Organic Entities beginning in April 2017.  After April 2018, Williams directly took investor funds.

78.     After April 2018, when investor funds began to be routed through the SRTK account, Williams kept records and categorized the frequent transfers he made between the SRTK account and his own personal accounts.

79.     Williams altered his own records to conceal at least two transfers in August and October 2018, totaling $160,000, from the STRK account to other accounts that he controlled. Williams changed the transactional data from the financial institution to falsely show that the money had been transferred to a vendor and to a North Macedonian account used for the business when in reality it went into his personal accounts.  Williams also changed the entry showing the purpose of the transactions in his records to hide the true nature of the transactions. Williams provided these falsified records to an accountant who used them to start to prepare a general ledger for the Pure Organic Entities.

80.     Additionally, in April 2018, Williams received $200,000 in investor funds that were deposited directly into one of his personal bank accounts, but he only transferred $140,000 of that amount to the SRTK account, which he recorded as a loan from himself to the company.

81.     Between April 2017 and January 2020, Williams received hundreds of thousands of dollars outside of payroll and claimed reimbursements for business expenses

**The Scheme Collapses**

82.     By early 2019, Swaffer began forming entities and seeking funding from investors to expand the marijuana business to Greece, and again misrepresented to potential investors the intended use of investor funds and the potential risks associated with the investment.  However, by mid-2019, payroll ceased to be funded on a regular basis, and Swaffer was ignoring messages from his employees.  Williams ceased working for the business by December 2019.

83.     Throughout the time they raised money from investors, Swaffer and Williams repeatedly assured investors that they were close to finalizing sales of large amounts of product and distributing profits.  Periodic investor newsletters described indoor and outdoor plant growing operations, inventory from harvests, and negotiations with multiple buyers in Europe. But no sales ever occurred and no profits were distributed to investors.

84.     Swaffer continued raising money from investors into February 2020, and he continued thereafter to send sporadic updates to investors claiming that a distribution was imminent.  For example, in December 2020, he emailed investors claiming millions of dollars of sales had closed and asked them to provide wire instructions to receive a distribution, which was never paid.

85.     Swaffer ceased contact with most investors in 2021, by which time several investors had filed lawsuits and he had become aware of the SEC's pre-filing investigation.

86.     Swaffer asserted his Fifth Amendment privilege during the SEC's pre-filing investigation in this matter and refused to answer any questions about the conduct described above.

**This Action Is Timely Filed**

87.     The misconduct at issue in this Complaint occurred between September 2016 and February 2020.

88.     Defendants Swaffer and Williams have entered into agreements with the SEC in which they agreed to toll, for the period beginning on August 1, 2021 through July 31, 2022, any statute of limitations applicable to the conduct and claims alleged herein.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder
(Against Swaffer and Williams)**

89.     The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 88 above as though fully set forth herein.

90.     By engaging in the conduct described above, Swaffer and Williams, directly or indirectly, singly or in concert with others, by use of the means or instrumentality of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

91.     Swaffer and Williams intentionally, knowingly, or recklessly engaged in the fraudulent conduct described above.

92.     By reason of the foregoing, Swaffer and Williams violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against Swaffer and Williams)

93.     The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 88 above as though fully set forth herein.

94.     By engaging in the conduct described above, Swaffer and Williams, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have employed devices, schemes or artifices to defraud.

95.     Swaffer and Williams intentionally, knowingly, or recklessly engaged in the devices, schemes, and artifices described above.

96.     By reason of the foregoing, Swaffer and Williams violated, and unless enjoined will likely again violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (3)]
### (Against Swaffer and Williams)

97.     The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 88 above as though fully set forth herein.

98.     By engaging in the conduct described above, Swaffer and Williams, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means

and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

99.     Swaffer and Williams intentionally, knowingly, recklessly, or at least negligently engaged in the activities described in this Count.

100.     By reason of the foregoing, Swaffer and Williams violated, and unless enjoined will likely again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

<u>**COUNT IV**</u>

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**
**(Against Swaffer, Williams, and POHIH)**

101.     The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 88 above as though fully set forth herein.

102.     By engaging in the conduct described above, Swaffer, Williams, and POHIH:  (a) without a registration statement in effect, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise, and (b) without a registration statement in effect, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement

20

had been filed; all in violation of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

103.    By reason of the conduct described above, Swaffer, Williams, and POHIH, directly or indirectly, violated, and, unless enjoined, will likely again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT V

### Unjust Enrichment of Relief Defendant
### (Against Rosalyn Swaffer)

104.    The SEC realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 88 above as though fully set forth herein.

105.    As described above, Rosalyn Swaffer received or benefitted from transfers of investor funds, derived from the Pure Organic Offerings, to accounts in her name, for the payment of joint debts she owed with Swaffer, or for her personal benefit or use.

106.    Rosalyn Swaffer was unjustly enriched by, and has no legitimate claim to, such funds as they are the proceeds of the securities law violations committed by Defendants Swaffer, Williams, and POHIH described in this Complaint.  As a result, she should be required to return her ill-gotten gains in an amount to be determined by the Court.

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that the Court:

A.    Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

B.    Enter an Order of Permanent Injunction restraining and enjoining:

    i.    Defendants Swaffer and Williams, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation

with them, and each of them, who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

    ii.    Defendant POHIH, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and77e(c)].

C.    Enter an Order requiring Defendants and Relief Defendant to disgorge the ill-gotten gains that they received, directly or indirectly, from the violations alleged herein, including prejudgment interest pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)].

D.    Enter an Order imposing appropriate civil penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

E.    Enter an Order barring Swaffer and Williams from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12

of the Exchange Act [15 U.S.C § 78l] or that is required to file reports pursuant to Section 15(d)

of the Exchange Act [15 U.S.C § 78o(d)], pursuant to Section 20(e) of the Securities Act [15

U.S.C. §  77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C § 78u(d)(2)].

     F.      Grant such orders for further relief the Court deems appropriate.

## JURY DEMAND

The SEC requests that this case be tried before a jury.


                           Respectfully submitted,


Dated:  September 1, 2022          s/  Michael D. Foster
                           Michael D. Foster (IL Bar # 6257063)
                           Meredith J. Laval (IL Bar # 6294356)
                           Matthew T. Wissa (IL Bar # 6324860)
                           Attorneys for Plaintiff
                           U.S. SECURITIES AND EXCHANGE
                           COMMISSION
                           175 West Jackson Boulevard, Suite 1450
                           Chicago, Illinois 60604
                           Telephone: (312) 353-7390
                           Facsimile:   (312) 353-7398
                           Email: fostermi@sec.gov
                           Email: lavalm@sec.gov
                           Email: wissam@sec.gov